UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GREGORY MATHIS,

        Plaintiff,

                                     Case No. 06-CV-13837
vs.                                  HON. GEORGE CARAM STEEH


ENCOMPASS INSURANCE COMPANY,

        Defendant.

_____/

OPINION AND ORDER FOLLOWING BENCH TRIAL
AND ORDER DENYING PLAINTIFF'S MOTION TO STRIKE
AFFIRMATIVE DEFENSE (#41)

      Plaintiff Gregory Mathis was injured in an August 25, 2005 motor vehicle accident.

Mathis received first-party no-fault personal protection insurance (PIP) benefits from his

insurer, defendant Encompass Insurance Company. Mathis also sued the at-fault driver,

and settled the claim for $100,000.00. On August 2, 2006, Mathis filed suit in state court

against Encompass to recover underinsured motorist insurance benefits pursuant to the

parties' insurance contract and M.C.L. § 500.3135 of Michigan's No-Fault Act, which allows

for the recovery of noneconomic losses if that person has suffered a "serious impairment

of body function" in a motor vehicle accident, and for the recovery of excess work loss

damages. The action was removed to federal court on August 28, 2006 based on federal

diversity jurisdiction under 28 U.S.C. § 1332.[1] Mathis did not file a jury demand with his

_____

      [1]  Mathis is a Michigan resident, while Encompass is an Illinois corporation with its
principal place of business in Illinois. See 28 U.S.C. § 1332(a), (c). The parties did not
dispute that the amount in controversy exceeded the $75,000.00 jurisdictional amount. See

complaint, and on May 1, 2007, moved for a jury trial. Magistrate Judge Virginia Morgan issued a July 7, 2007 Report and Recommendation recommending that the motion be denied and, upon reviewing Mathis' objections, the court denied the motion on August 2, 2007. On August 10, 2007, Mathis filed a motion to strike Encompass's affirmative defense that Mathis had not suffered a "serious impairment of body function," premised on Encompass's approval of Mathis' $100,000.00 settlement with the at-fault driver's insurer. On August 28, 2007, Encompass was ordered to file Mathis' No-Fault PIP claim file as a supplemental exhibit. The court conducted a bench trial over two days, August 28-29, 2007, and the parties filed supplemental post-trial briefs through September 27, 2007.

## I. Record Evidence

### A.

Following the August 25, 2005 motor vehicle accident, Mathis, then 40 years of age, presented at the Genesys Regional Medical Center with chest pains and apparent injuries to his right leg and left knee. X-rays revealed a fracture of the right tibia and the left patella. The right tibia fracture was an acute spiral fracture around an intramedullary rod that had been surgically implanted in April 1990 to treat a prior tibia fracture Mathis suffered in a hit-and run accident. The August 2005 tibia fracture extended from the distal third of the tibia down into the medial malleolus, or part of the ankle. The left patella fracture was a comminuted fracture involving the inferior medial aspect of the patella. Initial treatment included immobilizing the left knee in a brace and placing the right leg in a short-leg orthopedic boot below the knee. Mathis was hospitalized for nine days on non-weight

---

28 U.S.C. § 1332(b).

bearing status, from August 25, 2005 to September 2, 2005. On being discharged, Mathis was maintained non-weight bearing, and was sent home with a partial non-weight bearing restriction. Mathis required home nursing and health care services for approximately nine weeks, and received in-home physical therapy from Triumph Physical Therapy three times a week for five weeks. Mathis began outpatient physical therapy with Advanced Physical Therapy Center, P.C. on October 11, 2005, and was discharged on February 13, 2006 after cancelling or failing to attend 10 of 36 sessions.

During a September 12, 2005 follow-up appointment at the Genesys Regional Medical Center, Mathis complained to orthopedic surgeon Dr. James Heming of pain in his legs and problems "getting around," as well as some pain in his neck and right shoulder. X-rays of the shoulder showed no significant areas of injury. An MRI was taken of the left knee, confirming Dr. Heming's previous diagnosis of a fractured patella. Dr. Heming had Mathis' right leg placed into a long-leg cast upon concluding that the short-leg boot was not adequately controlling the fracture that extended into the ankle.

Mathis continued treating with Dr. Heming. On July 17, 2006, Dr. Heming performed arthroscopic surgery on the left knee. A small amount of loose cartilage was removed from within the inferior aspect of the patella, and approximately 2 millimeters of bone was removed to "decrease the significance of the articular step-off." Dr. Heming noted that "once the chondral plasty [sic] was performed, the knee revealed excellent tracking with flexion and extension. The superior two thirds of the patella revealed the remaining articular cartilage to be in good condition with only mild chondromalacia present." Dr. Heming performed arthroscopic surgery on Mathis' right ankle on September 27, 2006 after Mathis complained of pain when attempting to kneel. Dr. Heming removed a large anterior

bone spur and noticed that "the medial malleolus [showed] signs of cartilage damaged from previous fracture." A bone spur and some loose cartilage were removed, and "the loose cartilage from the previously healed fracture was . . . removed as well."

Dr. Heming examined Mathis on April 19, 2007, with Mathis reporting pain in his left kneecap with bending, and an inability to go into a squatting position. Mathis also reported pain in his right ankle, and "popping" and pain in his right wrist upon gripping. Dr. Heming reported that Mathis "walks with a mild antalgic gait . . . [and] has gross left patellofemoral crepitance with active quadriceps function." Dr. Heming gave his impressions of "[l]eft knee posttraumatic patellofemoral osteoarthritis, . . . [r]ight ankle posttraumatic osteoarthritis . . . [and] [r]ight wrist pain, possible median nerve irritation and flexor tendon tendonitis." Dr. Heming reached essentially the same conclusions in an August 2, 2007 follow-up examination.

Mathis was examined by Dr. J. Martin Ulrich on September 6, 2005 complaining of left-sided facial pain and of difficulty with fully opening his mouth. Dr. Ulrich advised Mathis that these symptoms arising from a traumatic wound and blunt facial injury "should continue to improve and wound involving inside of left mouth should heal completely."

On February 2, 2006, Mathis was referred to Dr. Richard Kovan complaining of numbness in his right arm. Dr. Kovan performed an EMG and found evidence of a "mild right ulnar neuropathy across the elbow." On February 22, 2007, Dr. Kovan again examined Mathis on referral from Dr. Heming. Mathis complained of left knee pain on squatting, kneeling, climbing stairs, and walking, intermittent right ankle pain and stiffness, and right grip weakness. Dr. Kovan followed-up on April 4, 2007, with Mathis reporting complaints of right ankle pain and left knee pain. Dr. Kovan did not perform any objective

4

tests, but prescribed a left knee brace.

At the time of the accident, Mathis was employed full-time, 8 hours per day, 40 hours per week, as a Service Technician for Prime Office Technology. Mathis had worked at Prime Office Technology since November 22, 2004 servicing and repairing copiers, fax machines, and printers. His job requirements included the abilities to get in and out of a vehicle several times a day, walk to and from a vehicle and up steps carrying 20 pounds multiple times a day, carry 50 pound maintenance kits on a weekly basis, and squat and kneel repeatedly throughout the day. Nearly six months after the accident, Mathis returned to work at Prime Office Technology on February 15, 2006. Only a little over a month later, however, Prime Office Technology terminated Mathis' employment effective April 26, 2006 due to his inability to meet the Service Technician job requirements. Federal wage and tax statements show Mathis earned $21,984.57 in 2005 and $6,154.81 in 2006.

**B.**

Mathis' medical history shows that, as a high school student, a 1982 arthroscopy was performed on his left knee without incident. Years later as an adult, Mathis presented at Family Orthopedic Associates on May 31, 1996 complaining of pain and swelling in his left knee as the result of "jamming" the knee playing volleyball. The knee was diagnosed as sprained. While working for SBC Ameritech as a Technical Specialist on August 24, 2001, Mathis injured his left knee and experienced sharp pain while attempting to place a ladder onto a service van. Mathis' job duties at SBC Ameritech included installing, repairing, and maintaining communication lines and equipment for SBC Ameritech customers.

In early June 2002, Mathis presented at the McLaren Occupational

Health/Convenient Care Center with a condition that was diagnosed as a left knee sprain. Mathis was given work restrictions of minimal climbing, no kneeling, and a sit/stand/walk option as tolerated. After a June 21, 2002 follow-up visit, the restrictions were revised to limited driving and walking, and no climbing or squatting. A June 26, 2002 follow-up continued the diagnosis of a left knee sprain, and continued the restrictions of no climbing or kneeling. On July 3, 2002, Mathis was diagnosed as having a torn meniscus in his left knee, referred for an MRI, and released to return to work with the restriction of no climbing. A July 17, 2002 MRI of the left knee revealed "[n]o definite meniscal tear" and "[q]uite significant degenerative chondromalacic changes of the patella." On July 23, 2002, the McLaren Occupational Health/Convenient Care Center reported Mathis' condition as "degenerative changes of the patella" and "knee strain - improving." Mathis was cleared to return to work that day without restrictions.

Mathis presented to Family Orthopedic Associates three months later, on October 29, 2002, complaining of pain, grinding, and "popping" in his left knee, and an inability at times to "lock my knee." Mathis reported that he injured his knee after climbing a telephone pole. Dr. Stephen Burton examined Mathis on November 1, 2002, noted the 2002 MRI result of "significant degenerative chondromalacia changes of the patella," and suggested use of a patellar knee brace and a "vigorous physical therapy program." Dr. Burton also advised Mathis "to avoid kneeling and squatting, and use care on the stairs."

Dr. Burton had earlier operated on Mathis' right leg in 1991, removing the proximal screws of the intramedullary rod placed in Mathis' right tibia following the April 1990 hit and run accident, leaving the rod in place. Mathis told Dr. Burton on April 16, 1991 that he felt "quite a bit better" with the screws removed, but complained of "numbness on the ulnar

aspect of the right hand[.]" Examining x-rays of the right leg, Dr. Burton concluded that the fracture was well healed, alignment was excellent, and he saw "no changes" in the ankle. Dr. Burton's other impressions included "[p]robable ulnar tunnel syndrome" in the right hand, and "[p]robable soft tissue injury, right foot." During a November 11, 1991 examination by Dr. Burton, Mathis reported that he felt he was "doing quite well," with "very little discomfort in the leg and occasional stiffness in the ankle. After examining x-rays, Dr. Burton wrote that "[n]o arthritic changes are noted." Dr. Burton's impressions were "[h]ealed fractured right tib-fib with locked rod in place[,]" "[p]robably ulnar tunnel syndrome right wrist[,]" and "[p]robable meniscal tear, right."

Mathis had worked for SBC Ameritech from June 18, 2001 until June 20, 2003. Mathis was terminated for failing to return to work on June 13, 2003 after his claim for a disability absence had been denied. Mathis attributed losing the job to migraine headaches, for which he received emergency medical treatment at the McLaren Regional Medical Center on May 22, 2003. Federal wage and tax statements show Mathis earned $36,104.79 in 2002 and $9,507.64 in 2003.

## C.

Orthopaedic surgeon Dr. William Higginbothan testified by way of his August 6, 2007 deposition. Dr. Higginbothan evaluated Mathis on behalf of Encompass with respect to his lower extremities following a May 18, 2007 physical examination and review of Mathis' history and medical records. Dr. Higginbothan diagnosed patellofemoral arthrosis of the left knee that is "probably preexistent" to the August 25, 2005 automobile accident, but aggravated by the "clinical measurable underlying change" of the patella fracture. Dr. Higginbothan opined that the "underlying structures" as seen in the MRI studies "would

pretty much stay the same," and that Mathis could experience "less symptoms in the future" by modifying his activities. Dr. Higginbothan testified that he would restrict Mathis from walking or climbing at unprotected heights, such as on narrow ladders, that he would not restrict Mathis from walking on uneven ground, and that he "wouldn't want [Mathis] going up and down five flights [of stairs] . . . eight or ten times a day." Dr. Higginbothan opined that "you have to kneel or squat in normal activities, but to the extent that [Mathis] would have to kneel or squat that was an essential feature of his work activities I'd recommend that he not do that."

Neurologist Dr. Wilbur Boike testified by way of his August 14, 2007 deposition. Dr. Boike evaluated Mathis on behalf of Encompass with respect to the claimed injury to the right ulnar nerve. Dr. Boike examined Mathis on May 16, 2007, took a medical history, and reviewed medical records. Dr. Boike found no evidence of cervical radiculopathy, ulnar neuropathy, or a brachial plexopathy. Dr. Boike opined that, because there were no symptoms of ulnar neuropathy immediately after the motor vehicle accident, Mathis did not suffer a traumatically induced right ulnar nerve injury.

Psychiatrist Dr. Elliot Wagenheim testified by way of his August 17, 2007 deposition after examining Mathis on June 29, 2007. Dr. Wagenheim was asked by Encompass to assess Mathis for depression or any other mental disorder that may have resulted from the August 25, 2005 motor vehicle accident. Dr. Wagenheim examined Mathis and reviewed his medical history. Dr. Wagenheim noted that Mathis had never treated with a psychiatrist, psychologist, or social worker for mental illness, but had treated with primary care physician Dr. Edward Christy with antidepressant medications from April 27, 2004 through February or April 2005. Dr. Wagenheim found no evidence of depression.

Treating orthopaedic surgeon Dr. Heming testified by way of his August 9, 2007 deposition. Dr. Heming stated that the right tibia fracture Mathis incurred in the August 25, 2005 automobile accident was located in a different area that the right tibia fracture experienced by Mathis in the April 1990 hit and run accident. Dr. Heming opined that the right ulnar injury identified by Dr. Burton was associated with the August 25, 2005 accident, and later testified that Dr. Boike's analysis of the EMG provided objective evidence that the injury had resolved. Dr. Heming acknowledged that, as of January 24, 2006, he planned on returning Mathis back to work at Prime Office Technology by February 15, 2006 with a 50-pound lifting limitation, and restrictions on climbing, bending, and squatting. Referencing his own March 28, 2006 report, Dr. Heming also acknowledged that Mathis' "right shoulder is feeling a lot better, " the "nerve symptoms in the right hand are slowly resolving," the "right leg reveals some stiffness at the ankle but no true complaints," that Mathis was walking with "a near normal gait," and that there was "no swelling" in the left knee.

On April 19, 2007, Dr. Heming placed work restrictions upon Mathis of no squatting or kneeling due to continuing difficulties with the left knee. Dr. Heming confirmed his April 19, 2007 impressions including left knee posttraumatic patellofemoral osteoarthritis, right ankle posttraumatic osteoarthritis, and gross left patellofemoral crepitance ("that, again, relates to grinding of the kneecap with active extension or straightening of the knee."). Dr. Heming examined Mathis on August 2, 2007, stating "he was doing pretty much the same." Dr. Heming opined that the left knee and right ankle osteoarthritis were in response to the fractures Mathis suffered in the August 25, 2005 motor vehicle accident, and that he was unsure of the "true etiology" of right wrist pain. With respect to the right ankle, Dr. Heming

expects that Mathis will continue to experience pain and other problems with bending, walking on uneven surfaces, and climbing. As to the left knee, Dr. Heming opined that "the amount of pain and problems that he has had with the kneecap will most likely worsen with time," and that he anticipates future surgery "from realignment of the kneecap, to attempted restoration of the articular surface, to the possibility of needing a knee replacement." Dr. Heming expects continuing restrictions with the left knee "with regard to bending, squatting, rising from a bent position, climbing stairs, or heavy lifting."

Dr. Kovan opined by way of deposition that Mathis suffered a mild right ulnar neuropathy as a result of the August 2005 accident. Based on an April 25, 2007 examination of Mathis' right knee, Dr. Kovan opined that Mathis' injuries will cause future pain and arthritis and resulting impairments. Dr. Kovan also opined that current therapy cannot ready Mathis to return to work.

## D.

Mathis testified at trial that he is a high school graduate, and attended one year of college. Mathis also graduated from a truck driving school. Mathis testified that, after spending nine days in the hospital, he was released home where he initially received 24-hour home nursing care and was required to use a bedpan, walker, and tray. Mathis testified to being involved in athletic activities in 2004 including volleyball, deer hunting, fishing, and mountain biking. Mathis was also actively involved in home improvement projects for himself, his girlfriend, and his parents. Mathis stated he was under no physical work restrictions prior to the 2005 auto accident, and sometimes carried "kits" weighing over 50 pounds. Mathis testified that, after the accident, he returned to work at Prime Office Technology on February 16, 2006, but could no longer physically do the job. Mathis

stated his pain is "on and off," and worsens if he becomes more active. Mathis testified that he is no longer able to wrestle with his 14-year old son, or hunt deer, that his fishing is limited, and that he can ride his mountain bike only for a short time. Mathis is still prescribed pain medication. Mathis remains unemployed, testifying that he has applied for jobs by sending out one to two resumes a day. Mathis acknowledged that he had experienced neurological problems with his arms prior to the accident that were attributed to "shingles." Mathis also acknowledged his continuing pre-accident condition of hypertension.

Mathis' girlfriend Mary Beth Collier testified that she has known Mathis since 2001 when they met at SBC Ameritech. Collier stated Mathis lost his job at SBC Ameritech due to attendance problems associated with migraine headaches. Her testimony was consistent with Mathis' testimony, adding that he can no longer participate in golf or bowling, and can swim for no more than 10 minutes at a time.

R.N. Nora Vinic of Vinic Medical Consulting, Inc. testified on behalf of Encompass to the effect that the injuries Mathis suffered as a result of the August 25, 2005 were now healed, and that Mathis' remaining complaints and limitations were linked to pre-existing conditions. Yet, Vinic opined that no records pre-dating August 2005 indicated Mathis had functional restrictions. Vinic admitted that her review of Mathis' condition, particularly the chronology of Mathis' left knee condition, ended as of July 2006, and that she did not take into account the April and August 2007 examinations of Dr. Heming. Vinic was unaware that Dr. Heming had diagnosed Mathis as having left knee posttraumatic patellofemoral osteoarthritis, right ankle posttraumatic osteoarthritis, and gross left patellofemoral crepitance.

C.P.A. Jeffrey Kaplan testified at trial as to his alternative calculations that, in terms of present value, Mathis will suffer $341,614.00 to $517,286.00 in lost wages from September 1, 2008 through December 2031, when Mathis reaches age 67.

## II. Legal Claims

Mathis was insured by Encompass for underinsured motorist coverage under an insurance contract in effect at the time of the August 25, 2005 motor vehicle accident. Encompass agreed under the contract to pay Mathis compensatory damages he was legally entitled to recover from an at-fault motor vehicle operator for bodily injuries Mathis sustained that were caused by the accident if Mathis reached a settlement with the at-fault driver's insurer and Encompass was given notice of the settlement. The insurance contract provided a $250,000.00 policy limit for underinsured motorist coverage, reduced by all sums paid to Mathis on behalf of an at-fault driver. As applied, the parties agree that the $250,000.00 underinsured motorist policy limit must be reduced by the $100,000.00 settlement Mathis reached with the at-fault driver's insurer. Encompass's maximum potential liability in thus $150,000.00.

M.C.L. 500.3135 of Michigan's No-Fault Act provides in pertinent part:

(1) A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.

(2) For a cause of action for damages pursuant to subsection (1) filed on or after July 26, 1996, all of the following apply:

(a) The issues of whether an injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:

(i) There is no factual dispute concerning the nature and extent of the

person's injuries.

(ii) There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination as to whether the person has suffered a serious impairment of body function or permanent serious disfigurement. However, for a closed-head injury, a question of fact for the jury is created if a licensed allopathic or osteopathic physician who regularly diagnoses or treats closed-head injuries testifies under oath that there may be a serious neurological injury.

(b) Damages shall be assessed on the basis of comparative fault, except that damages shall not be assessed in favor of a party who is more than 50% at fault.

\*       \*       \*

(3) Notwithstanding any other provision of law, tort liability arising from the ownership, maintenance, or use within this state of a motor vehicle with respect to which the security required by [M.C.L. § 500.3101] was in effect is abolished except as to:

\*       \*       \*

(b) Damages for noneconomic loss as provided and limited in subsections (1) and (2).

(c) Damages for allowable expenses, work loss, and survivor's loss as defined in sections [M.C.L. § 500.3107 to M.C.L. § 500.3110] in excess of the daily, monthly, and 3-year limitations contained in those sections. The party liable for damages is entitled to an exemption reducing his or her liability by the amount of taxes that would have been payable on account of income the injured person would have received if he or she had not been injured.

\*       \*       \*

(7) As used in this section, "serious impairment of body function" means an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life.

M.C.L. § 500.3135(1), (2)(a-b), (3)(b-c), (7) (footnotes omitted).  This matter proceeded to

a bench trial because material factual disputes remained regarding the nature and extent

of Mathis' injuries.  See M.C.L. § 500.3135(2)(a).  The parties do not dispute that Mathis

was not comparatively at fault in the auto accident.  See M.C.L. § 500.3135(2)(b).

To recover tort damages via his underinsured motorist coverage, Mathis had the

burden of proving that his alleged damages were caused by the August 25, 2005 motor vehicle accident in which he suffered an "objectively manifested impairment of an important body function that affects [his] general ability to lead his . . . normal life." M.C.L. § 500.3107(7); Kreiner v. Fischer, 471 Mich. 109, 130, 683 N.W.2d 611 (2004). Whether a plaintiff is "generally able" to lead his normal life concerns whether the plaintiff is "for the most part" able to lead his normal life. Id. The analysis involves "comparing the plaintiff's life before and after the accident as well as the significance of any affected aspects on the course of the plaintiff's overall life." Id at 132-133. The analysis is objective, and may include an evaluation of factors such as: (1) the nature and extent of the impairment; (2) the type and length of treatment required; (3) the duration of the impairment; (4) the extent of any residual impairment; and (5) the prognosis for eventual recovery. Id. at 133. As to the extent of any residual impairment, "[s]elf-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain do not establish this point." Id. at 133 n.17. Ultimately, whether a plaintiff's impairment affects his general ability to conduct the course of his normal life must be decided upon the totality of the circumstances, as no one factor is intended to be dispositive. Id. at 134.

Mathis moved prior to trial to strike Encompass's affirmative defense that Mathis had not suffered a "serious impairment of body function," arguing Encompass was precluded from disputing this claim because Encompass had approved Mathis' $100,000.00 settlement with the at-fault driver's insurer. Federal Rule of Evidence 408 prohibits the admission of evidence of a settlement when it is offered at trial to prove a disputed claim. Consistent with Rule 408, Mathis' attempt to prove his disputed claim for noneconomic damages with evidence that Encompass approved the $100,000.00 settlement is not well

taken.  Mathis' motion to strike is hereby denied.

## IV.  Findings and Conclusions

### A.  Mathis Suffered a Serious Impairment Of Body Function
### Caused By the August 25, 2005 Motor Vehicle Accident
### With Respect To His Lower Extremities

Mathis suffered a serious impairment of body function caused by the August 25, 2005 motor vehicle accident with respect to his lower extremities, that is, Mathis suffered objectively manifested impairments of important body functions in the accident relative to the use of his lower extremities which affected his general ability to lead his normal life. Mathis suffered traumatic fractures to his right tibia, right ankle, and left patella, along with associated structural cartilage damage, causing Mathis to develop right ankle posttraumatic osteoarthritis, left knee posttraumatic patellofemoral osteoarthritis, and gross left patellofemoral crepitance.  These conditions are objectively documented by inter alia August 25, 2005 x-rays, a September 12, 2005 MRI, and direct observations made by Dr. Heming during July 17, 2006 and September 27, 2006 surgeries.  Dr. Heming's and Dr. Kovan's opinions of causation are based on objective information gathered during their examination and treatment of Mathis, and their review of Mathis' medical history.  Mathis' lower extremity injuries and resulting osteoarthritis and patellofemoral crepitance were caused by the August 25, 2005 motor vehicle accident.

The evidence does not support a finding that these serious impairments resulted from pre-existing conditions.  Mathis sprained his left knee in 1982 playing high school football, and "jammed" his knee playing volleyball in 1996.  Mathis did not treat again for a left knee injury until August 24, 2001, and the injury was diagnosed in June 2002 as only a knee sprain.  Although Mathis was initially placed on work restrictions of minimal climbing,

15

no kneeling, and a sit/stand/walk option, a subsequent July 17, 2002 MRI ruled out a "definite meniscal tear," identifying instead "significant degenerative chondromalacic changes of the patella." Noting this objective information, and diagnosing the problem as "knee strain - improving," Mathis was released to return to work at SBC Ameritech on July 23, 2002 without any restrictions. Mathis continued working without incident for three months until he reinjured the knee while climbing a telephone pole. Although Dr. Burton advised Mathis on October 29, 2002 to use a knee brace, avoid kneeling and squatting, and use care on the stairs, Dr. Burton did not place Mathis on work restrictions, let alone permanent work restrictions. Mathis continued to work at SBC Ameritech for another eight months until his June 2003 discharge, unrelated to his left knee. Dr. Higginbothan himself recognized the "clinical measurable change" of the comminuted patella fracture suffered by Mathis on August 25, 2005. Dr. Higginbothan's opinion that the patellofemoral arthrosis was "probably preexistent" to the accident is not persuasive in light of the available objective evidence and opinions of Dr. Heming and Dr. Kovan. With respect to the 2005 fractures to Mathis' right leg and ankle, Dr. Burton concluded in April 1991, after surgery to remove intramedullary rod screws, that the earlier 1990 hit and run fracture was well healed and aligned, with "no changes" in the ankle. In November 1991, Dr. Burton saw no arthritic changes. Dr. Heming provided uncontradicted testimony that the 2005 right tibia fracture extended into the ankle, and was located in a different area than the fracture Mathis experienced in 1990. Mathis was able to start working for SBC Ameritech in June 2001, climbing telephone poles, more than four years before the August 25, 2005 accident, consistent with a finding that the 1990 fracture healed well before the August 25, 2005 automobile accident.

As a result of the injuries to Mathis' lower extremities caused by the 2005 accident, Mathis is not, "for the most part," able to lead his normal life when compared to his life before the accident.  It is clear that important overall aspects of his life have been changed by the accident.  Mathis suffered traumatic fractures on August 25, 2005, fractures that have left him with osteoarthritis in the right ankle and left knee, and patellofemoral crepitance in the left knee.  The court is persuaded by the testimony of Drs. Heming and Kovan that Mathis will continue to experience pain and advancing arthritis, and resulting limitations with respect to walking, bending, squatting, rising from a bent position, climbing stairs, and lifting over 50 pounds.  Dr. Higginbothan's testimony  is unconvincing on this record to the extent he attempts to contradict the opinions of Dr. Heming and Dr. Kovan.  The impairments in walking, bending, squatting, rising from a bent position, climbing stairs, and heavy lifting, and the residual pain impairment, are not self-imposed, and will continue with little abatement for the remainder of Mathis' life.  The prognosis for eventual complete recovery is not good.  Mathis pre-accident active and athletic lifestyle has been changed, as has his ability to continue employment in physically demanding jobs, jobs he once performed.  Mathis' lower extremity impairments and resulting residual impairments have significantly change the overall aspects of his personal and vocational life.

### B.  Mathis Did Not Suffer a Serious Impairment Of Body Function Caused By the August 25, 2005 Motor Vehicle Accident With Respect To Depression, Cervical Strain, His Right Ulnar Nerve, or His Right Wrist

Mathis did not suffer depression, cervical strain, or an injury to his right ulnar nerve or wrist that also affected his general ability to lead his normal life after the August 25, 2005 motor vehicle accident.   Consistent with the testimony of Dr. Wagenheim and Mathis'

medical records, any depression caused by the 2005 accident was transient. Although there is objective evidence in the record that could support a finding that Mathis suffered cervical strain and right ulnar nerve and wrist injuries, the court finds little persuasive evidentiary support for finding that these injuries and their resulting impairments changed the course of Mathis' life. Dr. Heming restricts Mathis from performing only heavy lifting, not any lifting, and noted on February 15, 2006 that the "nerve symptoms in the right hand are slowly resolving." Dr. Heming acknowledged that Dr. Boike's EMG analysis provided objective evidence that the ulnar injury had resolved. Dr. Kovan describes only a mild ulnar neuropathy. Considering the totality of the circumstances, including the lack of treatment required and the limited duration and extent of any identifiable impairment, Mathis has not proven that he suffered a life-changing depression, cervical injury, right ulnar nerve injury, or right wrist injury.

## C. Damages

Mathis seeks damages representing noneconomic losses and work loss extending beyond the 3 year limitations period of M.C.L. § 500.3107(1)(b)[2] governing PIP benefits. "Awards for personal injury rest within the sound judgment of the trier of fact, particularly awards for pain and suffering, and there is no absolute standard by which to measure such awards." Peterson v. Dept. of Transportation, 154 Mich. App. 790, 399 N.W.2d 414 (1987) (citing Precopio v. Detroit, 415 Mich. 457, 464-465, 330 N.W.2d 802 (1982)). Recovery in tort is not permitted for remote, contingent, or speculative damages. Ensink v. Mecosta

---

[2] PIP benefits are payable for "[w]ork loss consisting of loss of income from work an injured person would have performed during the first 3 years after the date of the accident if he or she had not been injured." M.C.L. § 500.3107(1)(b).

County General Hospital, 262 Mich. App. 518, 524, 687 N.W.2d 143 (2004).  The plaintiff has the burden of proving his damages with reasonable certainty, and damages are not considered speculative simply because they cannot be ascertained with mathematical precision.  Id. at 525.

### i. Noneconomic Losses

Mathis has not specified the amount of noneconomic damages he seeks other than claiming he is entitled to recover the full $250,000.00 of his underinsured motorist insurance coverage less the $100,000.00 settlement set-off.  Mathis' active and athletic lifestyle has been significantly changed by the August 25, 2005 accident, requiring Mathis to adjust his personal and work life to the physical limitations of his lower extremity impairments and the accompanying pain, suffering, frustration, and fatigue.  The court need not, and cannot, calculate with mathematical precision the noneconomic losses Mathis has and will continue to incur throughout the remainder of his relatively young life.  Considering all of the circumstances as set forth in this opinion, and finding that Mathis will continue to experience noneconomic losses due to the serious impairments of body function he sustained as a result of the August 25, 2005 automobile accident, the court finds that Mathis is entitled to a total of $175,000.00 in damages to fully compensate his continuing noneconomic losses.  This total noneconomic damage award must be offset by the $100,000.00 settlement Mathis received from the at-fault driver's insurer, resulting in a total award of $75,000.00.

### ii.  Work Loss

An injured party may recover excess economic work loss damages under M.C.L. § 500.3135(3)(c) even if they do not meet the threshold requirements to recover

noneconomic damages under M.C.L. § 500.3135(1). <u>Ouellette v. Kenealy</u>, 424 Mich. 83, 87, 378 N.W.2d 470 (1985). An injured party is not automatically entitled to work-loss benefits by simply proving that he is unable to return to his own job due to a motor vehicle accident. <u>Bak v. Citizens Ins. Co. of America</u>, 199 Mich. App. 730, 733, 503 N.W.2d 94 (1993). Under both tort law and the No-Fault Act, the plaintiff has a duty to mitigate damages. <u>Id</u>. at 738. The fact finder must determine, under the totality of the circumstances, what work the plaintiff could have found and whether he should have reasonably taken that work. <u>Id</u>. at 739. Reasonableness of mitigation is a question of fact. <u>Id</u>.

Depending upon the calculation used, Mathis seeks $341,614.00 to $517,286.00 for wages he will lose from September 1, 2008 through December 2031 when he reaches age 67. The calculations simply extrapolate over 23 years what Mathis was making at Prime Office Technology before he was terminated. The damage claim necessarily presumes that Mathis is and will remain unemployable due to the August 25, 2005 accident until he reaches age 67 given his current restrictions relative to walking, bending, squatting, rising from a bent position, stair climbing, and heavy lifting. Mathis will be 43 years old on September 1, 2008 and has a high school degree and college experience. Mathis' job search is limited to sending out one to two resumes a day. Mathis efforts at physical therapy have been hindered by conditions unrelated to the August 15, 2005 auto accident, such as hypertension, as shown by his spotty attendance at Advanced Physical Therapy Center. Mathis has not shown that, with reasonable effort, he will be unable to find any employment by September 1, 2008. Mathis has certainly not demonstrated that, with reasonable effort, he will nonetheless remain unemployed for 23 years because of the

accident. Future wage loss damages under the instant circumstances are too remote, contingent, and speculative to sustain an award. Ensink, 262 Mich. App. at 524. Simply proving that he is unable to return to his job at Prime Office Technology as a Service Technician does not entitle Mathis to recover wage loss damages beginning in September 2008 through the year 2031. Bak, 199 Mich. App. at 733. Mathis has failed to prove that he is entitled to recover excess work loss damages.

## V. Conclusion

Mathis' motion to strike is hereby DENIED. For the reasons set forth above, judgment will enter in favor of plaintiff Gregory Mathis and against defendant Encompass Insurance Company in the amount of $75,000.00.

SO ORDERED.

Dated: January 29, 2008

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on January 29, 2008, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk